UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANTHONY CUSAMANO
a/k/a Michael Bonano,

                    Plaintiff,

                                        9:08-CV-755
v.                                     (FJS/GHL)

SCOTT CARLSEN, JANE DOE, Nurse,
Ulster Correctional Facility, MS. SARKOWSKI,
Officer, Ulster Correctional Facility, SCOTTY ROCK,
Officer, Ulster Correctional Facility, JOHN DOE #1,
Unit Officer, Ulster Correctional Facility, JOHN DOE #2,
Unit Officer, Ulster Correctional Facility, JOHN DOE,
Sergeant/Supervisor, Ulster Correctional Facility,
JOHN DOE #1, Mess Hall Officer, Ulster Correctional
Facility, JOHN DOE #2, Mess Hall Officer, Ulster
Correctional Facility, and JOHN DOE, Supervising
Sergeant, Mess Hall, Ulster Correctional Facility,

                    Defendants.
_____

APPEARANCES:                    OF COUNSEL:

ANTHONY CUSAMANO
11-R-1271
Plaintiff, *pro se*
Gouverneur Correctional Facility
Scotch Settlement Road
P.O. Box 480
Gouverneur, NY 13642

HON. ERIC T. SCHNEIDERMAN        WILLIAM J. McCARTHY, JR, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, New York 12224

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendant Scott Carlsen's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 43.)

## I.   FACTUAL AND PROCEDURAL SUMMARY

### A.   Procedural History

Plaintiff, currently incarcerated at Gouverneur Correctional Facility, commenced this action pursuant to 42 U.S.C. § 1983 against Defendants Scott Carlsen, "Ms. Sarkowski," "Scotty Rock," Duane Taylor, and several John and Jane Does for violation of his constitutional rights. (Dkt. No. 1.)  Defendants "Ms. Sarkowski" and "Scotty Rock" were unable to be served, and it was later determined that there were no individuals with those names employed by the Department of Corrections and Community Supervision.  (Dkt. Nos. 5, 14.)

The remaining defendants moved to dismiss on September 24, 2008, and the motion was granted on September 5, 2009, by the Hon. Frederick J. Scullin.  (Dkt. Nos. 11, 20.)  The sufficiency of Plaintiff's claims was addressed at length in that Order, and the parties' familiarity with that Order is presumed.   Plaintiff moved to reconsider, and Judge Scullin reinstated the first and sixth causes of action only against Defendant Carlsen.  (Dkt. Nos. 21 and 26.)  A review of Judge Scullin's decision reinstating the two causes of action against Defendant Carlsen reveals that although the Judge found Plaintiff's renewed arguments only "somewhat" persuasive, he found it prudent to reinstate a supervisory defendant to allow for discovery regarding the

identities of the John and Jane Doe defendants.  (Dkt. No. 26 at 4-5.)  However, the Court

confirmed the dismissal of Defendant Taylor as a Defendant, and the dismissal of the seventh,

eighth, and ninth causes of action for due process and equal protection violations, remained

intact.  (Dkt. No. 26 at 6 n.4.)  Defendant Carlsen has now moved for summary judgment

pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 43.)  Plaintiff filed a response.  (Dkt.

No. 50.)  A reply was not filed.

    In his response to this motion, Plaintiff indicated that he had ascertained the identities of

the misidentified and unidentified Defendants, and requested permission to amend his complaint

to include these Defendants.  (Dkt. No. 50-2 at 13.)  This Court requested that Plaintiff submit a

proposed amended complaint containing the changes he wanted to make.  (Text Order dated

October 3, 2011.)  Plaintiff complied,[1] and a review of the proposed amended complaint reveals

that Plaintiff only adjusted the names of the Defendants, and did not modify any of the causes of

action.  As such, this Court will go forward and address the substance of all the remaining causes

of action contained in the original complaint, even though this motion has been filed solely on

behalf of Defendant Carlsen.[2]

    **B.**    **Facts**

        **1.**    **"Basic Amenities" and Lack of Medical Treatment**

Plaintiff Anthony Cusamano arrived at Ulster Correctional Facility ("Ulster") on

---

    [1]This document was entered onto the docket as an "amended complaint."  The Clerk is instructed to change this text to reflect that this document is a "proposed amended complaint." (Dkt. No. 54.)

    [2]This Report-Recommendation and Order will be directed at the complaint at Dkt. No. 1 and refer to the misidentified and unidentified Defendants, as it is still the operative complaint in this action.

November 21, 2007.  (Dkt. No. 1 ¶ 1.)[3]   Upon his arrival, Plaintiff was given clothing and

toiletries, including a bar of soap, toothbrush, toothpaste, comb, and a cup.  *Id*. ¶ 2.  He did not

receive shower slippers, shampoo, or skin lotion.  *Id.* ¶ 3.  His funds had not yet been transferred

from his previous facility, so he was unable to purchase shower slippers or other items from the

commissary.  *Id.* ¶ 7.  He claims that he developed a foot fungus as a result of showering without

shower slippers, and also claims that his skin became dry and ashy as a result of bathing with the

facility-issued soap and from not being provided with lotion.  *Id.* ¶¶ 6, 11.  He also claims he had

an itchy and flaky scalp due to not being given shampoo.  *Id.* ¶ 12.

Plaintiff attended sick call on November 26, 2007, and reported that he had cracking,

scaly feet, ashy dry skin, and an itching and flaking scalp, and was referred by the nurse to the

commissary in order to purchase remedies.  *Id.* ¶ 13.  He informed the nurse that he had no funds

due to his transfer, and she repeated "commissary" and did not supply him with the requested

products.  *Id.* ¶ 14.  He also complained to the nurse that he was having difficulty clearing his

throat and requested lozenges, to which the nurse allegedly responded "drink plenty of water;

lozenges don't do anything."  *Id.* ¶ 15.

Plaintiff eventually developed wide fissures and peeling skin on his feet.  *Id.* ¶ 18.  On

December 11 or 12, 2007, Plaintiff again attended sick call, where he received skin lotion,

dandruff shampoo, and athlete's foot ointment.  (Dkt. No. 1 ¶ 44; Dkt. No. 43-2 ¶ 19; Dkt. No.

50 ¶ 19.)

---

[3]The paragraph numbers in the complaint refer to the paragraphs in the section entitled
"Statement of Facts," beginning on page seven.

### 2. Cold Temperatures

Plaintiff was transferred into Ulster housing unit E2 in early December, where he claims it was cold in the sleeping quarters and in the bathroom.  (Dkt. No. 1 ¶¶ 22-23.)  He claims he could feel a cold draft through the vents, and asked Officer "Scotty Rock" to close the vents.  *Id.* ¶¶ 24-25.  The Officer responded "I can't do that."  *Id.* ¶ 25.  Plaintiff then made a similar request to another E2 unit officer the following day, who responded "I turn it on and off during the course of the day" but, at that time, maintained the vents in the same position.  *Id.* ¶ 26.  On or about December 6, 2007, he asked Officer "Ms. Sarkowski" if she would shut off the vents; it appears from the complaint that she did not.  *Id.* ¶¶ 27-29.  Plaintiff stated in his complaint that "Ms. Sarkowski" notified her sergeant about the cold temperatures and arranged for a maintenance crew to come inspect the housing unit and "attempt to make repairs."  *Id.* ¶¶ 32-33.

Due to the cold temperature in the unit, Plaintiff slept with his sweater on, and occasionally his coat.  (Dkt. No. 1 ¶ 43; Dkt. No. 43-5 at 25:2-9.)[4]  The mess hall doors were often propped open during meals and Plaintiff would wear his coat.  (Dkt. No. 1 ¶ 45; Dkt. No. 43-5 at 36:6-11.)

### 3. Water Quality

In his complaint, Plaintiff alleges that the water in the showers and bathroom sinks at Ulster was brown and contaminated.  (Dkt. No. 1 ¶¶ 8, 10, 40.)  He did not drink this water; it was used for showers, washing his face, and brushing teeth. (Dkt. No. 1 ¶¶ 8-10; Dkt. No. 43-5 at 16:17-24.)  During his time at Ulster, Plaintiff experienced diarrhea intermittently, which he

---

[4]The page numbers of Plaintiff's deposition refer to the page numbers of the transcript, and not those assigned by the ECF system.

attributed to the "visibly brown" water.  (Dkt. No. 43-5 at 17:6-18:3.)

### C.    Grievances

According to the complaint, Plaintiff filed grievances complaining that he did not receive "basic amenities," that there was "discolored water" in the showers and sinks, and that medical staff was deliberately indifferent to his medical needs.  (Dkt. No. 1 ¶ 20.)  It is unclear when these grievances were filed.[5]  Plaintiff did not receive a response to these grievances during the remainder of his time at Ulster.  *Id.* ¶ 21.

On December 10, 2007, Plaintiff allegedly filed a grievance containing the signatures of several other inmates ("petition grievance"), complaining about the cold temperatures in housing unit E2 as well as the failure to provide "basic amenities" and the lack of treatment by Ulster's medical staff.  *Id.* ¶¶ 35-39.  He received no response during the remaining six days of his stay.  *Id.* ¶ 39.  This grievance was not included in the record.[6]  On December 17, 2007, Plaintiff allegedly filed another petition grievance regarding the cold temperatures in the mess hall.  *Id.* ¶¶ 45-46.  He was transferred to Queensborough Correctional Facility that same day.  *Id.* ¶ 46.

On December 25, 2007, Plaintiff wrote to Defendant Carlsen, who was Superintendent of Ulster Correctional Facility at the time, and included copies of all the grievances that he had submitted.  (Dkt. No. 1 ¶ 48; Dkt No. 43-2 ¶ 9; Dkt. No. 43-3 at 5; Dkt. No. 50 ¶ 9.)  Defendant Carlsen responded by a memorandum on December 31, 2007, advising Plaintiff that if he filed grievances, they would be responded to, but that he would not respond to petition grievances.

---

[5]There is a grievance attached to Plaintiff's response to this motion that is dated November 29, 2007, but that grievance only addresses the brown water.  (Dkt. No. 50-3 at 1.)

[6]There is a grievance attached to Plaintiff's response to this motion dated December 10, 2007, however, this grievance complains about the brown water.  (Dkt. No. 50-3 at 2.)

(Dkt. No. 43-3 at 8.)  He also wrote that he gave "very serious consideration to canceling Plaintiff's transfer."  *Id.*  Plaintiff received a letter dated January 9, 2008, from Ulster inmate grievance program supervisor Duane Taylor, who stated that Plaintiff's grievances had been investigated and responded to, and included a summary of the results of the investigation.  *Id.* at 10.

During his stay at Queensborough, Plaintiff allegedly sent letters to Brian Fischer, who was Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"), and Daniel Stewart, who was Chairman of the New York State Commission on Corrections.  (Dkt. No. 1 ¶ 54.)  Plaintiff claims he sent another letter to Defendant Carlsen,[7] providing a copy of the final petition grievance and asking to appeal Mr. Taylor's findings.  *Id.* ¶ 54.[8]  Plaintiff stated in his complaint that he sent these same papers to Chairman Stewart, and to the Commissioner of the New York State Department of Health, and received no responses.  *Id.* ¶¶ 55-56.  None of these papers has been included in the record.

Defendant states that Plaintiff did not appeal any of his grievances to the Central Office Review Committee ("CORC"), and is thus barred from proceeding for failure to exhaust his administrative remedies.  (Dkt. No. 43-7 at 8.)[9]  Defendant submitted a letter from the Department of Corrections and Community Supervision containing a list of eight grievances that

---

[7]Plaintiff's complaint states that he sent this letter to "Ulster CF Superintendent Mr. Crowley," but it is presumed he meant Defendant Carlsen.

[8]There are two paragraphs labeled number 54; this citation refers to the second paragraph 54.

[9]Citations to Defendant's Memorandum of Law use the internal page numbers of the document, and not the ones assigned by the ECF system.

Plaintiff had taken to the CORC, and there were no appeals regarding incidents that occurred at Ulster.  (Dkt. No. 43-6 at 2.)

### D.    The Pending Motion for Summary Judgment

After Judge Scullin's Orders of September 5, 2009, and May 21, 2010, (Dkt. Nos. 20 and 26), the remaining claims are the first and sixth causes of action[10] against Defendant Carlsen for "implementing or maintaining policies" that are in violation of Plaintiff's right to be free from cruel and unusual punishment; the second cause of action against Nurse Jane Doe[11] for inadequate medical treatment; and the third and fourth causes of action against "Scotty Rock,[12]" "Ms. Sarkowski,[13]" and John Doe[14] for the cold temperatures in the housing unit and mess hall at Ulster.  (Dkt. No. 1.)  As stated above, even though the motion has been brought solely by Defendant Carlsen, in the interest of judicial economy this Court will address the substance of all the remaining causes of action.

## II.   ANALYSIS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[10]The first and sixth causes of action are essentially the same.  *See* Dkt. No. 1 at 19 and 21.

[11]Identified in Plaintiff's proposed amended complaint as Donna Baker.  (Dkt. No. 54.)

[12]Identified in Plaintiff's proposed amended complaint as Jeff Scott.  (Dkt. No. 54.)

[13]Identified in Plaintiff's proposed amended complaint as Jeanette Siatkowski.  (Dkt. No. 54.)

[14]Identified in Plaintiff's proposed amended complaint as David R. Galm.  (Dkt. No. 54.)

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material[15] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).

### B.      Exhaustion of Administrative Remedies

Defendant argues that Plaintiff's claims should be dismissed because he failed to exhaust his administrative remedies by not appealing his grievances to the CORC.  (Dkt. No. 43-7 at 6-8.)  Plaintiff argues that he submitted copies of his grievances that he wished to appeal to the Corrections Central Office, and the fact that he did not "specifically earmark" his appeal for the CORC is a "hypertechnical" requirement that should be overlooked.  (Dkt. No. 50-2 at 4-5.)

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

---

[15]A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program.  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7 (2010).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.  First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence.  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a) (2010).  A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue.  *Id.* at (b)(1).  If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing.  *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision.  If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a

10

written decision within twenty calendar days of receipt of the grievant's appeal.  Grievances

regarding DOCCS-wide policy issues are forwarded directly to the central office review

committee ("CORC") for a decision under the process applicable to the  third step.  *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the

superintendent's written decision.  CORC is to render a written decision within thirty calendar

days of receipt of the appeal.  *Id.*  at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to

commencing litigation, he has failed to exhaust his administrative remedies.  *Woodford v. Ngo*,

548 U.S. 81 (2006).

Defendant's counsel submitted a letter from DOCCS stating that Plaintiff did not appeal

any grievances to the CORC "regarding treatment and conditions at Ulster Correctional Facility."

(Dkt. No. 43-6 at 1.)  Attached to the letter was a list of appeals that Plaintiff had filed.  *Id.* at 2.

The list does not contain any grievances filed between October 16, 2006, and January 30, 2008,

which includes the time Plaintiff was incarcerated at Ulster, and the two grievances filed in

January and February 2008 were for issues unrelated to the claims in the complaint.  *Id.*

Plaintiff argues that he did submit his grievance information to DOCCS, and, if he failed

to earmark them for the CORC, that should be overlooked as a "hypertechnical" requirement.

(Dkt. No. 50-2 at 4-5.)  However, Plaintiff appealed six grievances prior to the events alleged in

the complaint, so it appears that Plaintiff was familiar with how to appeal a grievance to the

CORC.  (Dkt. No. 43-6 at 2.)  The record indicates that Plaintiff knew the appeal process prior to

the alleged occurrences at Ulster, yet did not follow it with respect to the particular incidents

alleged in his complaint.  Therefore, this Court is not inclined to overlook Plaintiff's failure to

submit his grievances to the CORC, and concludes that he failed to exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry.  The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies.  *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).[16]  First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."  *Hemphill*, 380 F.3d at 686 (citation omitted).  Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."  *Id.* (citations omitted).  Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."  *Id.* (citations and internal quotations omitted).

Here, as discussed above, an administrative remedy was available to Plaintiff.  However, Defendant did not preserve the exhaustion defense by asserting it in his answer to the complaint.  (Dkt. No. 28.)  Failure to exhaust remedies is an affirmative defense under the PLRA.  *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Failing to plead an affirmative defense in an answer constitutes

---

[16]The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford*, 548 U.S. 81.  *Chavis v. Goord*, No. 07-4787-pr, 2009 U.S. App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

a waiver of that defense. *Alster v. Goord*, 745 F. Supp. 2d 317, 332 (S.D.N.Y. 2010). Defendant in this action did not raise failure to exhaust administrative remedies as an affirmative defense in his answer and thus has waived it; therefore, I recommend that Plaintiff's causes of action not be dismissed on the grounds that he failed to exhaust his administrative remedies.

### C.  Eighth Amendment Violations

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

To satisfy the subjective component, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Where a prisoner claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Wilson v.*

*Seiter*, 501 U.S. 294, 302-03 (1991).

A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

### 1.    Brown Water

Plaintiff alleges that the water in the showers and the bathroom sinks at Ulster was brown; it turned his white underclothes brown and left brown residue on the shower floor. (Dkt. No. 1 ¶¶ 8-10; Dkt. No. 43-5 at 9:10-10:16.)  This water was used for showers, washing up, and brushing teeth; it was not used for drinking.  (Dkt. No. 1 ¶¶ 8-10; Dkt. No. 43-5 at 16:20-24.)  Plaintiff testified at his deposition that he drank water from a fountain.[17]   (Dkt. No 43-5 at 16:22.)

A prisoner's allegation of contaminated water may state a claim under the Eighth Amendment.  *Bellezza v. Fischer*, No. 05 Civ 98, 2006 U.S.Dist. LEXIS 76962, at *10, 2006 WL 3019760, at *4 (S.D.N.Y. Oct. 24, 2006) ("Water that is suitable for drinking and bathing is undeniably one of 'life's necessities,' and, as defendant concedes, the Eighth Amendment therefore requires that it be supplied to inmates.").[18]

Defendant submitted some documents from Environmental Labworks, Inc., and the

---

[17]There is nothing in the record to indicate that the water at the drinking fountain was brown, and Plaintiff does not appear to be alleging that it was contaminated.

[18]The Court will provide Plaintiff with a copy of unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

14

County of Ulster Department of Health, in support of his position that "there were no problems with the water between November and December 2007." (Dkt. No. 43-3 ¶¶ 13-14 and 15-33.) However, these records are not authenticated[19] and Defendant has provided no explanation of the records, e.g., who conducted the tests, the methods used, how to interpret the results, or how complete the records are. Additionally, as Plaintiff points out in his response, the documents provided by Defendant at most suggest that there was not bacteria in the water. (Dkt. No. 50-1 ¶ 4.) Defendant has not disputed the color of the water and has not provided an explanation for it. It is entirely unclear what role, if any, Defendant Carlsen played with respect to the water at Ulster. Given the insufficient records submitted by Defendant, and drawing all reasonable inferences in Plaintiff's favor, there is a triable issue of fact as to whether the brown water at Ulster was objectively a sufficiently serious condition as to rise to the level of a constitutional violation.

The next question in the analysis is whether the subjective prong has been satisfied, i.e., whether the Defendant acted with deliberate indifference by disregarding an excessive risk to Plaintiff's health or safety. *Farmer,* 511 U.S. at 837. Safe water is unquestionably necessary for

---

[19]Motions for summary judgment must be supported by admissible evidence. *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008). Hearsay evidence is not admissible unless it falls within an exception to the hearsay rule. Fed. R. Evid. 802. Prison records, although hearsay, may be admissible under the business records exception to the hearsay rule. That exception renders admissible records of "acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge" but only if such records are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." Facts supporting admissibility must be supplied "by the testimony of the custodian or other qualified witness or by certification" that complies with Federal Rule of Evidence 902. Fed. R. Evid. 803(6). Here, none of the records is supported by any custodial affidavit and have not been certified. Therefore, the records are not admissible. *See Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980).

every human being, and knowingly providing unsafe water at Ulster could reasonably be interpreted as disregarding an excessive risk to inmate health and safety.

Defendant asserts that he did not have knowledge of Plaintiff's complaints about Ulster until after Plaintiff's transfer.  (Dkt. No. 43-7 at 4.)  In his response to this motion, Plaintiff argues that Defendant Carlsen had notice of Plaintiff's complaints and the conditions at Ulster while Plaintiff was still there.  (Dkt. No. 50-2 at 3.)  To support this argument, Plaintiff cites to Defendant Carlsen's  memorandum of December 31, 2007, wherein Defendant stated that he does "not respond to petitions" and that he gave "very serious consideration to canceling [Plaintiff's] transfer."  (Dkt. No. 43-3 at 8.)  This language supports the possibility that Defendant was already aware of the grievances before Plaintiff left the facility, otherwise he could not have entertained "canceling" his transfer.  Defendant did not offer a reply to this assertion, and this Court finds that Plaintiff's interpretation of the memorandum is a fair one.  As a result, there is a question of fact as to whether Defendant Carlsen had knowledge of the condition of the water at Ulster, and failed to remedy it.[20]

There remain questions of fact about the seriousness of the brown water at Ulster, and whether Defendant Carlsen had knowledge of, and disregarded, a serious risk to inmate safety. Therefore, I recommend that the motion for summary judgment be denied with respect to the claim of unsafe water.

### 2.    Claim of Eating and Sleeping in a Cold Environment

Plaintiff was transferred into housing unit E2 in early December, where he claims it was

_____

[20]If Defendant had submitted complete and properly authenticated documentation of efforts to ensure safe water at Ulster, the Court could have considered that as evidence that Defendant did not disregard inmate safety.  However, as discussed above, that is not the case.

16

cold in the sleeping quarters and in the bathroom.  (Dkt. No. 1 ¶ 23.)  He claims he could feel a

cold draft through the vents, and asserts in his complaint that he asked "Scotty Rock," "Ms.

Sartkowski," and "John Doe" to close the vents, and they refused.  *Id.* ¶¶ 25-27.  The mess hall

doors were often propped open during mealtimes.  *Id.* ¶ 45.  Plaintiff continued to feel cold in the

unit up until his transfer on December 17, 2007, approximately two weeks later.  *Id.* ¶¶ 45-46.

Three or four days after Plaintiff brought the issue of the cold temperature to the attention

of the E2 housing unit officers, "Ms. Sarkowski" arranged for a maintenance crew to try to repair

the heating unit.  *Id.* ¶ 32.  She also reported the cold to her sergeant.  *Id.* ¶ 33.

A prisoner's exposure to frigid temperatures for a prolonged period of time may state an

Eighth Amendment claim.  *See Gaston v. Coughlin*, 249 F.3d 156 (2d Cir. 2001) (summary

judgment not appropriate when inmate was subjected to prolonged exposure to cold temperatures

because of numerous broken windows in his cell block that were not repaired for an entire

winter); *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir. 1988) (reversing grant of summary judgment

where inmate had been deliberately exposed to bitter cold in his cell block for three months);

*Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967) (reversing dismissal when inmate was stripped

nude and placed in a cell with wide open windows during subfreezing temperatures for several

days).  Unlike these cases, Plaintiff was only exposed to the cold for about two weeks and was

permitted to wear heavy clothes, both while he slept and while he ate.  (Dkt. No. 43-5 at 25:2-9

and 36:6-11.)  There is nothing to indicate how cold it actually was, or that the cold was so

severe as to cause substantial harm.  In fact, Plaintiff conceded at his deposition that being able to

wear his coat during meals mitigated or eliminated his claim.  (Dkt. No. 43-5 at 36:6-11.)  There

is no indication that Plaintiff's exposure to the cold was so serious as to deny him "the minimal

civilized measure of life's necessities," the standard outlined in *Farmer*, 511 U.S. at 834.

Additionally, it appears that the corrections staff were also exposed to the same conditions as Plaintiff; "Ms. Sarkowski" was also wearing her coat all day and all night as well as most of the officers assigned to the unit. (Dkt. No. 1 ¶ 29.) As previously noted, "Ms. Sarkowski" reported the cold to her sergeant and called a maintenance crew. *Id.* ¶¶ 32-33. As a result, it cannot be said that the officers acted with deliberate indifference. Nor is there anything to indicate that any of the officers caused the cold temperatures in Ulster housing unit E2. It appears that the cold temperatures arose from a faulty heating unit, not from any actions taken by corrections staff or by Defendant Carlsen. Plaintiff acknowledged in his complaint that a maintenance crew was called to address the problem, and, in fact, he submitted proof to that effect in response to this motion. (Dkt. No. 50-3 at 6-7.)

The allegations in Plaintiff's third and fourth causes of action relating to the cold temperatures in Ulster do not constitute violations of the Eighth Amendment. If this Court had determined that there were underlying constitutional violations, there would be a triable issue of fact as to whether Defendant Carlsen had notice of the cold conditions and failed to intervene or remedy the violations. However, that question need not be addressed, as this Court has determined that there is no merit to Plaintiff's underlying claim. *See Toole v. Connell*, No. 9:04-CV-0724, 2008 WL 4186334, at *7 (N.D.N.Y. Sept. 10, 2008) (holding that a defendant accused of failing to investigate and remediate conduct already found not to be actionable cannot be held liable for a constitutional deprivation"); *Linares v. Mahunik*, No. 9:05-CV-625, 2006 WL 2595200, at *11 (N.D.N.Y. Sept. 11, 2006) ("Plaintiff cannot sustain a supervisory liability claim as there was no wrong for [Defendant] to remedy since there is no constitutional violation.").

18

Therefore, for the above stated reasons, I recommend that Plaintiff's causes of action against Defendant Carlsen for the cold temperatures be dismissed, and that the third and fourth causes of action in the original complaint against the individual corrections officers regarding the issue of cold temperatures be dismissed *sua sponte*.

### 3.      Denial of "Basic Amenities"

Plaintiff alleges that, upon his arrival at Ulster, he was not provided with "basic hygiene-related articles such as shower slippers, shampoo and skin lotion[.]"  (Dkt. No. 1 ¶ 3.)  He stated that he did receive a bar of soap, toothbrush, toothpaste, comb, and drinking/rinsing cup.  *Id.* ¶ 2. Plaintiff showered barefoot because he did not have shower slippers and he alleges that he developed a foot fungus as a result.  *Id.* ¶ 6.  He also claims that his skin took on an "ashy-white, dry texture" due to bathing with "harsh, state-issue Corcraft soap, and not having been provided with skin lotion."  *Id.* ¶ 11.  He developed an itchy, flaky scalp, allegedly due to not being given shampoo.  *Id.* ¶ 12.  When Plaintiff went to sick call on December 11 or 12, 2007, he was provided with skin lotion, dandruff shampoo, and athlete's foot ointment.  (Dkt. No. 1 ¶ 44; Dkt. No. 43-2 ¶ 19; Dkt. No. 50 ¶ 19.)

The denial of these items does not rise to the level of an Eighth Amendment violation. As noted by Judge Scullin in his Order of September 5, 2009:

> The fact that [Plaintiff] was unhappy with the quality of the soap, or was apparently unwilling to use the soap to wash his hair, does not in any way demonstrate that his health or safety was endangered.  Moreover, being deprived of shower slippers, shampoo, lotion, and acceptable soap for a period of approximately twenty-six days is not 'objectively sufficiently serious' and does not amount to the denial of 'the minimal civilized measure of life's necessities.'

(Dkt. No. 20 at 12.)

Plaintiff readily admits that he was provided with toiletries upon arrival.  (Dkt. No. 1 ¶ 2.)

Although the Second Circuit has found that the deprivation of toilet paper can rise to the level of unconstitutional conditions of confinement, a deprivation of other toiletries "for approximately two weeks - while perhaps uncomfortable - does not pose such an obvious risk to an inmate's health and safety to suggest that the defendants "were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that they also drew the inference.'" *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) (citing *Farmer*, 511 U.S. at 837 (punctuation omitted); *see also Chavis v. Kienert*, No. 9:03-CV-0039, 2005 U.S. Dist. LEXIS 41920, at *66-67, 2005 WL 2452150, at *21 (N.D.N.Y. Sept. 30, 2005).[21]

The denial of these items does not amount to unconstitutional conditions of confinement under the Eighth Amendment.  Therefore, because there is no underlying violation, I recommend that the claim against Defendant Carlsen based upon supervisory liability for failure to provide shower slippers, shampoo, and skin lotion, be dismissed.

### 4.    Denial of medical/pharmaceutical treatment

In his complaint, Plaintiff asserts that he went to sick call on November 26, 2007, and reported to Defendant Nurse Jane Doe that he was suffering from cracking, scaly feet, ashy dry skin, and itching and flaking scalp; he also complained of phlegm in his chest and throat.  (Dkt. No. 1 ¶¶ 13, 15.)  She referred him to the commissary to purchase any items that might relieve his discomfort and refused his request for lozenges.  *Id.* ¶¶ 13-15.  At that time, he did not have any funds in his prison account and was thus unable to purchase anything.  *Id*. ¶ 14.   When he returned to sick call on December 11 or 12, 2007, he was given ointment for his feet, skin lotion,

---

[21]For further review of case law in support of this conclusion, reference is made to Judge Scullin's Order of September 5, 2009.  (Dkt. No. 20 at 12-13.)

and dandruff shampoo.  (Dkt. No. 1 ¶ 44; Dkt. No. 43-5 at 12:21-13:9.)

As previously stated, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer,* 511 U.S. at 832.  In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care.  *Farmer*, 511 U.S. at 832; citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted).  "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996), *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain.  *Chance*, 143 F.3d at 702.

21

However, the analysis does not end there.  Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996).  Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.  *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need.  *Farmer*, 511 U.S. at 835; *Ross v. Giambruno*, 112 F.3d 505 (2d Cir. 1997).  An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference."  *Estelle*, 429 U.S. at 105-06.  Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment."  *Id.*  Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Id.; Smith v. Carpenter*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")  However, malpractice that amounts to culpable recklessness constitutes deliberate indifference.  Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703.

Plaintiff, in his second cause of action, asserts that Nurse Jane Doe (later identified as Donna Baker) violated his Eighth Amendment right to adequate medical care when she refused

to provide him with medical and/or pharmaceutical salves or medications for his "physical maladies."  (Dkt. No. 1 at 19; Dkt. No. 43-5 at 40:1-16.)

As stated in Judge Scullin's September 5, 2009, Memorandum-Decision and Order in this action, "the denial of foot fungus cream, lotions, and medicated shampoo, while causing discomfort to Plaintiff, cannot be found to endanger Plaintiff's health or safety and therefore does not present a facially valid Eighth Amendment claim."  (Dkt. No. 20 at 13.)  Judge Scullin went on to say that "the physical afflictions that Plaintiff suffered - namely foot fungus, dry skin, and flaky scalp - when reviewed under the Eighth Amendment standards, do not amount to serious medical conditions and did not in any way endanger Plaintiff's physical health or safety."  *Id.* Indeed, "[f]ungal infections of the feet have not been found to constitute serious medical needs..."  *Scott v. Laux*, No. 9:07-CV-936, 2008 WL 4371778, at *5 (N.D.N.Y. Sept. 18, 2008). Additionally, dry or cracked skin has been found not to be sufficiently serious as to satisfy the objective prong of an Eighth Amendment analysis.  *See Swindell v. Supple*, No. 02 Civ. 3182, 2005 U.S. Dist. LEXIS 1517, at *20, 2005 WL 267725, at *7 (S.D.N.Y. Feb. 3, 2005) (finding that dry and cracked skin "are not of such an urgent and substantially painful nature as would satisfy the objective prong of the deliberate indifference standard").[22]

Additionally, the brief mention in Plaintiff's complaint of feeling like there was "phlegm in [his] chest and throat" (Dkt. No. 1 ¶ 15) is not a sufficiently serious medical need under the Eighth Amendment.  *See Davidson v. Scully*, 155 F. Supp. 2d 77, 86 (S.D.N.Y. 2001) (sinus congestion and sore throat due to allergies do not produce death, degeneration, or extreme pain

---

[22]For further review of case law in support of this conclusion, reference is made to Judge Scullin's Order of September 5, 2009. (Dkt. No. 20 at 13-14.)

and are thus objectively not a serious medical need).

Plaintiff's physical complaints do not rise to a sufficiently serious level to satisfy the objective prong of the Eighth Amendment analysis, thus the subjective prong need not be addressed.  Therefore, I recommend that Plaintiff's claim against Nurse Jane Doe for denial of medical supplies/treatment be dismissed *sua sponte*.  Additionally, because Plaintiff does not state a facially valid claim for lack of adequate medical treatment for the reasons stated in the point above, I recommend that the claim against Defendant Carlsen based upon supervisory liability also be dismissed.

### D.    Qualified Immunity and Eleventh Amendment Immunity

Defendant Carlsen argues that he should be entitled to qualified immunity.  Additionally, he argues that he is entitled to Eleventh Amendment immunity to the extent that claims are being asserted against him in an official capacity.  (Dkt. No. 43-7 at 8-11.)

Under the doctrine of qualified immunity, "a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights."  *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).  As discussed above, it is unclear what Defendant Carlsen did or did not do with respect to the water at Ulster, and whether he did or did not have notice of Plaintiff's complaints about the water.  Given these ambiguities, qualified immunity is not appropriate at this time.  *See Bellezza*, 2006 U.S. Dist. LEXIS 76962, at *15, 2006 WL 3019760, at *5 (qualified immunity not warranted when Defendant did not identify what actions he took to address water quality).

With respect to Defendant's claim of Eleventh Amendment immunity, it is true that a claim against a state official in his official capacity is essentially a claim against the state and barred by the Eleventh Amendment. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993). However, there is nothing in Plaintiff's complaint to indicate that any of the Defendants are being sued in their official capacity, therefore, this argument is irrelevant.

### E.     Leave to Amend Complaint

As outlined above, in his response to this motion, Plaintiff requested leave to file an amended complaint containing the correct names of the Defendants that he had obtained through discovery. (Dkt. No. 50-2 at 13.) Due to the fact that this Court is recommending dismissal of all of the causes of action involving the proposed Defendants, an amendment would be futile. Where it appears that granting leave to amend is unlikely to be productive or the amendment is futile, it is not an abuse of discretion to deny leave to amend. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Therefore, I recommend that Plaintiff's request to file an amended complaint be denied.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 43) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that all claims be dismissed except the claim against Defendant Carlsen regarding the brown water at Ulster, and it is further

**RECOMMENDED** that Plaintiff's request to amend his complaint be **DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Bellezza v. Fischer*, No. 05

25

Civ 98, 2006 U.S. Dist. LEXIS 76962, 2006 WL 3019760 (S.D.N.Y. Oct. 24, 2006); *Chavis v.*
*Goord*, No. 07-4787-pr, 2009 U.S. App. LEXIS 13681, 2009 WL 1803454 (2d Cir. June 25,
2009); *Chavis v. Kienert*, No. 9:03-CV-0039, 2005 U.S. Dist. LEXIS 41920, 2005 WL 2452150
(N.D.N.Y. Sept. 30, 2005); *Linares v. Mahunik*, No. 9:05-CV-625, 2006 WL 2595200 (N.D.N.Y.
Sept. 11, 2006); *Scott v. Laux*, No. 9:07-CV-936, 2008 WL 4371778 (N.D.N.Y. Sept. 18, 2008);
*Swindell v. Supple*, No. 02 Civ. 3182, 2005 U.S. Dist. LEXIS 1517, 2005 WL 267725 (S.D.N.Y.
Feb. 3, 2005); and *Toole v. Connell*, No. 9:04-CV-0724, 2008 WL 4186334 (N.D.N.Y. Sept. 10,
2008); and it is further

**ORDERED** that the Clerk is instructed to correct Dkt. No. 54 to reflect that it is a
proposed amended complaint.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file
written objections to the foregoing report.  Such objections shall be filed with the Clerk of the
Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**
**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing
*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §
636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: December 16, 2011
      Syracuse, New York

George H. Lowe
United States Magistrate Judge